Opinion of the court.
Kirkpatrick C. J.
The real state of this case does not very clearly appear from the abstract of the pleadings handed up to *the court. It is to be taken, however, so far as can be collected from the argument, that Vanuxem and Clark, the plaintiffs, were residents of the city of Philadelphia ; that Samuel Hazlehurst, the defendant, who pleads this plea, together with several others of the name of Hazlehurst, had a commercial house in Baltimore, where the debt was originally contracted; that after this, this defendant obtained a discharge under an insolvent law of the commonwealth of Pennsylvania, which law discharges not only from the imprisonment of the person, but also from the debt itself; and after this discharge, this action was prosecuted here. And the question brought up upon the demurrer, is, whether, this discharge is a good bar in ■ this court.
The plaintiffs in support of their action, and in derogation of the plea, say
1. In the first place, that the act of the commonwealth of Pennsylvania is contrary to the constitution of the United States, and therefore inoperative and void; first, because it is a law upon the subject of bankruptcies, and therefore contrary to that clause of the said constitution, which says, “ The congress shall have power to establish uniform laws upon the subject of bankruptcies through *221 out the United States;” and secondly, because it is a law impairing the obligation of contracts, and therefore trary to that clause of the said constitution, which says, “ No state shall pass any law impairing the obligation of contracts.” And they say
2. In the second place, that a discharge under a law of the commonwealth of Pennsylvania, even though not contrary to the constitution of the United States, cannot operate upon nor discharge a debt contracted in the state of Maryland.
As to the first of these positions. I observe that by the strict rules of the common law, the same measure was for the merchant and the husbandman, each was to look to his own risk, each was to pay to the last penny. But as commerce increased, England too was obliged to bend her rigid rules, and to provide specially for the security of those engaged in this hazardous employment. Accordingly, towards the close of the reign of Henry VIII, there was passed an act of parliament, entitled “ An act against such persons as do make bankrupts,” being the first upon this subject: thus introducing as sir E. Coke tells us (4 Inst. 277) as well the name as the wickedness of bankrupts fromfo*reign nations. The name, however, and I believe I may say, with sir E. Coke, the wickedness of bankrupts, being once introduced, the bankrupt laws grew up before the American revolution, by a multitude of amendments, provisions, and alterations, superadded the one to the other, by successive statutes, to be in themselves a great system.
Totally distinct from this system, they had also, at the same time, their insolvent laws, made for the relief of those imprisoned for debt. These insolvent laws were never considered as a part of the bankrupt system. They respected a different class of men, their objects were different, their effects were different, they were differently administered. The insolvent laws were optional, the insolvent petitioned for the benefit of them upon the terms proposed; the bankrupt laws were compulsory, the creditors petitioned for their benefit, and seized the whole estate of the bankrupt without his consent or co-operation. These insolvent laws were never, either in common *222 conversation, or in their books, or in their juridical called bankrupt laws, or in any manner of way confounded with them.
The British colonies in America, now composing the United States, never, so far as I have been informed, considered the bankrupt laws of Great-Britain as extending to this country, nor did any one of them adopt the same by any colonial act. After the example of the mother country, they had their insolvent laws for the relief of insolvent debtors, applicable equally to all classes of men imprisoned for debt, but they had nothing like what was generally understood by a bankrupt system. In the language of the country, in the language of the forum and of the senate, insolvency and bankruptcy, insolvent laws and bankrupt laws, were distinct things. The insolvent laws operated equally upon all men, and had for their object only the liberation of the insolvent from the imprisonment of his person; while the bankrupt system respected only merchants and traders, and their negotiations and concerns; it took a retrospective view of their proceedings; it detected their frauds; it set aside their fraudulent contracts and conveyances; it restored to the fair creditor the proceeds of that property to which he was justly entitled, and it dealt with the debtor according to his merits; if misfortune had overtaken him in the paths of integrity and truth, it discharged him from imprisonment; exonerated him from his debts, and left him something *wherewith to begin the world anew; but if not, it left him to the rigid rules of justice, and sometimes inflicted penalties besides.
This was the state of things when the constitution was formed. The language of the constitution then, by all fair construction, ought to be taken according to the common understanding of the subject matter to which it was applied, and according to its generally received meaning and import at that day. And if so, all laws which have in view the objects of the bankrupt system, as it then existed, and especially those which exonerate the debtor from his debt, which was peculiar to that system, and had a place in no other, I say all such laws, by whatever name the individual states may choose to call *223 them, are, according to the understanding of that day, and according to the true intent of the constitution, bankrupt laws. And of this description is the act of the commonwealth of Pennsylvania, now under consideration. The question then presents itself; had the commonwealth of Pennsylvania constitutional power to pass this act ?
That in a confederacy of states so intimately connected in their negotiations and concerns as these United Slates must necessarily be, the law upon this subject should be the same throughout the whole, was an obvious principle.
The evils resulting from a different practice, would have been incalculable to individual states, and highly derogatory to the character of the union, considered as one nation, in their commercial intercourse with foreign countries. The constitution, therefore, in order to prevent these evils, has delegated to congress the power of establishing uniform laws upon the subject of bankruptcies throughout the United States.
At first view it would seem strange that a doubt could have arisen on those words. The object is clearly expressed, the power is unreservedly given. What more explicit language, what more simple and obvious mode of expression could have been used, to declare, that the bankrupt laws, when introduced, should be uniform throughout the United States, and that the congress should have the power of establishing those laws ? How then is the force of this language evaded ?
It is said that the several states, as independent sovereignties, before they entered into this compact, had the power of making bankrupt laws as well as all other laws ; that this power is not prohibited to them by the words of the compact, and that therefore it is necessarily retained, and still remains unimpared in their hands. To this argument it is answered, that though this power is not, in words, prohibited to the states, yet it is in words granted to the United States, and as it cannot subsist in the hands of both at the same time, this grant amounts to a prohibition ; for, that, according to the principle of construction engrafted upon the constitution by the tenth amendment, those powers only are reserved to the states, which are neither delegated to the United States nor prohibited to the states. But *224 then it is said again, that there is a distinction to be made 'between laws and uniform laws, upon this subject, and that the power of establishing the latter only, is delegated to ..the United States, while that of establishing the former still remains in the states; or, in other words, that the power of the states is not taken away, but only subjected to the control of the United States when they shall think proper to exercise that control. This seems to be the strongest light in which the argument for the power of the states can be placed, and yet even in this light it rests upon a subtilty too nice, I think, to be admitted as a rule of construction in.a concern so important. The powers given to the congress are absolute and unconditional ; there is no case in which they can be resumed by the states, or in which they revert back to the states upon any misuser, non-user, or any other contingency whatsoever. Besides, even if this were so, and if this power remained in the states until exercised by congress, yet there is no room for this objection here, for congress have actually taken possession of it, and exercised it so far as they thought expedient. When, in their judgment, the necessity of the country called for it, they established a bankrupt law, and carried it into full effect, and when again that necessity ceased, they repealed it without a substitute, thereby impliedly declaring, that no such law was then further necessary, and leaving merchants and traders to stand upon the same footingwith all other men in society. Shall an individual state then, be permitted to question , their judgment, to tell them they have acted wrongly, and therefore to wrest the power from their hands and to exercise it themselves ? Is it possible that this power can be bandied about like a tennis-ball and become the legitimate property of the adroitest player? It cannot be. But after all, the question does not so much depend upon any nice criticism upon the words and clauses of the constitu*tion, as upon its general intent, which it is thought can hardly be mistaken. Contemplating the difficulties and injustice which would necessarily result from the legislating of the individual states, on this subject, led, as they frequently would be, by local interests, and still more frequently driven by popular impulse; the conven *225 tion manifestly intended, that as soon as bankrupt laws should become necessary, there should be a uniform systern throughout the United States, and for that purpose delegated this power exclusively to congress. They gave to congress the whole power of regulating commerce; in a commercial point of view, they raised up the United States ns one great consolidated empire; they delegated to congress every power necessary to make it such; and among these, as necessarily appertaining to the commercial system, they delegated to them this power also.
The second reason in favour of the plaintiffs position, to wit, that the act is unconstitutional, because it impairs the obligation of contracts, depends, I think entirely upon the first; for if the commonwealth of Pennsylvania have a right to make bankrupt laws, they have a right to discharge the debtor from his debt; this, according to the common understanding, at this day, being of the essence of such lawrs. But if they have not such right, then the words of the constitution are too broad for them to escape. “ Fo state shall pass any laws impairing the obligation of contracts.” I say from these I do not see how they can escape, unless they resort to another quibble similar to the one about laws and uniform laws, and affirm that annulling or destroying the contract altogether, is not, in a strict grammatical sense, impairing its obligation.
In the first position then, I think the plaintiffs stand upon strong ground ; ground from which their adversary can never drive them by fair fight, whatever he may gain through the timidity of those to whom it ultimately belongs to declare the victory.
It is well known that this question has divided the opinions of learned men and able judges; it is understood that even judges of the Supreme Court of the United States themselves, at their circuits, have rendered different judgments upon it. It is with great diffidence therefore, a diffidence which could be overcome only by the imperious nature of the duties of the seat upon which I sit, that I express a sentiment at all; but being thus constrain *ed, I must express it according to the convictions of my own mind.
2. As to the operation of the act, considering it as the *226 act of an independent sovereign power, and altogether of constitutional objections.
ft js admitted by the counsel that we have no decision J m any of our sister states, upon a case exactly similar to the present, and that the decisions which seem to embrace the principle are different in different states.
In our own state the only case in which the question has been at all agitated, is that of Hale v. Ross, or, as I have it in my notes, Hall v. Ross, decided in May term 1811, and reported in Penn. 807. There the contract was in Pennsylvania, where both parties then lived ; the discharge was in New-York, under a law of the state of NewYorlc, and the action was in New-Jersey. Judge Pennington in delivering his opinion in this case seems to rely upon what he calls a maxim, found in the writings of one Huberus, a civilian of pretty ancient date; which maxim, as he cites it, is. to this effect. “ That by the courtesy of nations, whatever laws are carried into execution within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a prejudice to the rights of other governments or their citizens.” In the application of this maxim, he admits that the courts of Pennsylvania might see cause to disregard this law of the state of New- York, under which this discharge was made, because it had done an injury to one of her citizens by absolving his debtor from the obligation of paying his debt. But then he does not admit that it would be correct in the courts in New-Jersey to do the same thing, and to disregard it also, because whatever injury it might have done to a citizen of Pennsylvania, it had done none to the government of New-Jersey, nor to any citizen thereof. And upon this ground, out of comity to the state of New-York, he holds the discharge to be a good bar. My brother Rossell in delivering his opinion in that case, says, he had inclinded to the opinion that a discharge under such circumstances was not a good bar, but that upon looking into certain cases adjudged in the commonwealth of Pennsylvania, and reported in Dal. Rep. he had been led to think that the courts there, would receive this discharge as a. valid act, and that they *would not expect that we should go farther in protect *227 ing tlieir citizens against the law and judicial proceedings of a sister state than they themselves would do. And upon that ground he concurred in supporting the discharge.
I was not satisfied with the reasoning of either of my brethren in this case.
The rights of men in matters of property, are perfect rights. They are not to yield to principles of comity between states.
There are principles which govern the relations of nations and limit their rights and powers with regard to one another, which principles are obligatory upon the courts of all the states considered as independent sovereignties. And if by these principles, in the case cited, the state of New-York, acting as such independent sovereignty, had a right to discharge the debtor from this debt contracted in Pennsylvania, then the courts of Pennsylvania were as much bound, as those of New-Jersey, to give effect to such discharge; and if not, then neither the courts of Pennsylvania, nor of New-Jersey, nor of any other state, could lawfully admit it as a bar.
Save this case then, not exactly in point and liable I think, to these objections, we have no precedent to guide us, no adjudication upon which we can rely to direct our judgment.
Some stress has been laid, in the argument upon that clause of the constitution which says, “ Full faith and credit shall be given in each state, to the public acts, records and judicial procedings of every other state,” and upon the act of congress of May 26, 1790, to carry that clause into effect. But certainly the clause itself can never be so construed as to give effect to the public acts of a state which are contrary to the constitution, or which usurp, or exercise the sovereignty of another state, or in any way infringe upon its rights, as is alleged in this case. The question then seems to be untouched either by decision or by constitutional provision, and to be left upon those principles, which limit the power of independent states with regard to each other.
We are put then to inquire what effect the acts of one independent sovereign state can have upon contracts *228 made in a different state and by citizens of a different
jn considering this question, we may lay out of tbe case the consideration that Vanuxem and Clark, the plaintiffs, were citizens of Pennsylvania; because having gone into the state of '*Maryland,.and entered into a contract which was to be executed there, or in other words, sold property which was to be paid for there, they were, for this purpose, citizens of Maryland, and are entitled to her protection and to the benefit of her laws. We may lay out of the case also, the effect which the bankrupt laws of one country may be permitted to have in another country ; for being applicable to merchants and traders only, they have by a sort of tacit consent, become a part of the law merchant, in a certan sense, and, with that, extend throughout the mercantile world.
The simple question then presents itself, whether one sovereign state can discharge the citizens of another sovereign state from a debt contracted in the latter, and to be paid there. And the very statement of the question carries with it, to my mind, a decisive answer. The legislative power of every sovereignty is strictly limited to its own territory and to its own citizens. All the negotiations of men in the civil state, all their contracts, obligations, and duties, have relation to, and are founded upon the 'law of the state in which they are made. To protect, govern, and enforce these, is one branch, and a very important branch of a sovereign power ; a branch which • can never be touched without humbling and breaking down the sovereignty itself.
Let us suppose the commonwealth of Pennsylvania to make an act discharging from their debts, wherever contracted, all men who shall become resident in the city of Philadelphia within one year from the passing thereof. Will it be pretended that such a discharge shall operate and be carried into effect in all other governments ? And why not as well as the present ? Both the one and the other are mere acts of arbitrary power, breaking down and trampling upon the rights of individuals, from supposed motives of public policy, policy in which that commonwealth alone is interested. Will'it be answered, *229 that here has been the cessio bonorum of the civilians, that the man has surrendered all he had, and that the creditors, wherever they may have been, have had, or might have had their proportional dividend of the property, and that therefore humanity as well as policy requires that the debtor should be discharged from his debt ? But who hath constituted the commonwealth of Pennsylvania to be arbiter in this case ? Who hath made her keeper of the conscience, and the guardian of the policy of other governments ? Is she to prescribe *the terms upon which debts and contracts throughout the whole world are to be discharged ?
It is admitted that every sovereign state, merely from the force of its sovereignty, may discharge from debts and contracts made within its own territory, and governed by its own laws ; and that such discharge attaches to the debt or contract, as well as to the person of the debtor, and is available in all governments, and in all their courts. If a stranger shall have gone into such state, and sold his merchandise, or other commodities, so that a debt is due to him from a citizen thereof, he shall be bound by such discharge, for, for this purpose he himself was a citizen; and even though he should afterwards find his debtor in his own, or another government, he cannot maintain a suit against him. The debt is discharged. And this is the only legitimate application, as it relates to this subject, of the quotation from PLuberus, before spoken of. But as to debts contracted in ^another state, and protected by the laws of another state, such discharge, upon whatever pretences it may be made, is totally void.
It is admitted further that every state may prescribe the mode of administering justice within itself. It may say that the debtor shall not be imprisoned for his debt, or, if imprisoned, that he shall be discharged from Ins imprisonment, and that, either absolutely or upon conditions prescribed; it may lend to the citizen of another state, the force of its laws to compel the execution of contracts made in such other state, and perhaps upon the principles established among nations, it may be under obligation to do so; but it is under no obligation to do *230 more; it is under no obligation to provide other remedies those which it affords to its own citizens, in like circumstances. The commonwealth of Pennsylvania might, therefore, fairly discharge this defendant from the imprisonment of his person, for the imprisonment itself is but the mere mode of enforcing the contract, and no part of the contract itself. But then this discharge of the person can have no force, but within the limits of the commonwealth; for the contract still remaining unimpaired, and in its full force, either the state of Maryland or any other sovereignty will carry it into effect according to its own mode of administering justice in like cases, the discharge in Pennsylvania notwithstanding.
Upon the whole then, I am'of opinion that this law of the commonwealth of Pennsylvania, discharging the debtor from his *debt, is a bankrupt law ; and if not a bankrupt law, then a law impairing the obligation- of contracts; and that in either case it is contrary to the constitution, and void. I am further of opinion that if it be neither a bankrupt law, nor a law impairing the obligation of contracts, then, by that law which governs the relation of nations, it is confined in its operation to debts contracted within the common-wealth itself, and wholly void as to those contracted in other states. This, therefore, being a debt contracted in the state of Maryland, neither that act, nor any proceeding under it, can be set up in this court, as a bar to the recovery of it.